IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:11-CT-3263-FL

| | |
|---|---|
| GREGORY REQUINT ARTIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | ORDER |
| ) | |
| DONALD EARL SATTERWHITE, ) | |
| GWENDOLYN ANN BROOKS, ) | |
| MICHAEL L. ROACH, VERYL ) | |
| SCOTT-BOYD, JASPER LEE ) | |
| CAMERON, and DOMINIC H. ) | |
| ETTSON, ) | |
| ) | |
| Defendants. ) | |

This matter comes before the court on defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (DE 51). The motion was fully briefed. In this posture, the issues raised are ripe for adjudication. For reasons set forth below, the court denies defendants' motion.

**STATEMENT OF THE CASE**

On December 16, 2011, plaintiff, a state inmate, filed this action, through counsel North Carolina Prisoner Legal Services ("NCPLS"), pursuant to 42 U.S.C. § 1983 and under the Eighth Amendment of the United States Constitution against defendants Donald Earl Satterwhite ("Satterwhite"); Gwendolyn Ann Brooks ("Brooks"); Michael L. Roach ("Roach"); Veryl Scott-Boyd ("Boyd"); Jasper Lee Cameron ("Cameron"); and Dominic H. Ettson ("Ettson"). Plaintiff alleges that defendants, state correctional officers at Polk Correctional Institution ("Polk"), used

excessive force against him in violation of the Eighth Amendment to the United States Constitution during a prison cell extraction. In addition to his excessive force claim, plaintiff alleges that Satterwhite, Brooks, Roach, and Boyd failed to protect him from the alleged excessive force exerted by defendants Cameron and Ettson.

Defendants subsequently filed a motion to dismiss, arguing that plaintiff failed to state a claim upon which relief may be granted. Defendants' motion was denied. On December 20, 2013, defendants filed the instant motion for summary judgment on basis that plaintiff cannot establish a constitutional violation. Defendants also assert the affirmative defense of qualified immunity.

Defendants rely in furtherance of their motion on plaintiff's discovery responses, Boyd's affidavit, and the North Carolina Department of Public Safety's ("DPS") policies and procedures governing high security maximum control ("Hcon") status and the use of force. They also rely on plaintiff's disciplinary history and proceedings, plaintiff's deposition, defendants' responses to plaintiff's discovery requests, and plaintiff's medical records. Finally, defendants place heavy reliance upon the video recording of the instant alleged use of force incident.

In opposition to the motion, plaintiff relies on his deposition testimony, Polk's standard operating procedure for use of force, documentation of discipline against defendants Cameron and Ettson, and plaintiff's medical records.

**STATEMENT OF THE FACTS**

The following is a summary of the undisputed facts in this action, with exceptions as noted where the facts presented by the parties diverge. Plaintiff, a state inmate, was housed at Polk in its Hcon unit when this cause of action arose on November 25, 2010. (Pl.'s Depo. p. 17.) During this time, plaintiff temporarily was living in observation cell SC-98 because repairs were being made

to his regular cell. (Id. p. 24.) The observation cell portion of the Hcon unit was an area consisting of approximately three cells, SC-97, SC-98, and SC-99, which were separated from the rest of the Hcon unit.[1] (Id. p. 29.)

On November 25, 2010, an "Anticipated Use of Force Team" was assembled to transport another Hcon inmate, Devon Robinson ("inmate Robinson"), from his regular Hcon unit cell to a cell in the observation unit located near plaintiff. (Boyd Aff. ¶ 33; Pl.'s Depo. pp. 33-36.) At this point, the parties versions of the facts differ somewhat. According to defendants' version of the facts, plaintiff began banging on his cell window at approximately 1:10 p.m., which was shortly after inmate Robinson was placed in an observation unit cell near plaintiff. (Boyd Aff. ¶ 25.) Boyd, in response, immediately went to plaintiff's cell and ordered plaintiff to stop. (Id.) Plaintiff ignored Boyd's orders and continued to bang on his cell door. (Id.)

Although plaintiff admits to knocking on his cell window, plaintiff disputes defendants' characterization of the incident. According to plaintiff, plaintiff knocked on his cell window because he wanted to alert a nurse to an issue with inmate Robinson's handcuffs being too tight. (Pl.'s Depo. p. 61.) In response, the nurse told plaintiff that Satterwhite would not allow her to check inmate Robinson's handcuffs. (Id.) A third inmate, Tebores Harris ("inmate Harris"), housed in cell SC-99, next began kicking his cell door and knocking on his window in an attempt to get the nurse's attention. (Id. p. 65.) Plaintiff attempted to get inmate Harris to stop banging on the window, telling Harris that the nurse was working on getting relief for inmate Robinson. (Id. p. 65.)

---

[1] Plaintiff estimates, in his deposition, that there are four cells in the observation unit, but only SC-97, SC-98, and SC-99 are mentioned in plaintiff's deposition.

3

According to plaintiff, as plaintiff and Harris were attempting to get the nurse's attention, the correctional officers involved in Robinson's cell extraction were nearby removing the gear used in the cell extraction. (Id. pp. 58-59.) Plaintiff heard Satterwhite instruct the group to "go in and get Artis." (Id. p. 51.) Correctional officer Kearney then asked Satterwhite why they were extracting plaintiff, to which Satterwhite responded: "Get dressed. Suit back up." (Id. pp. 51, 58.)

It is undisputed that after directing the anticipated use of force team to get dressed, Satterwhite approached plaintiff's cell with a can of mace. (Id. p. 66.) According to defendants, however, Satterwhite could not, and did not deploy pepper spray into plaintiff's cell because plaintiff blocked both his food service trap and the slider gap in his cell. (Boyd Aff. ¶ 32.) Plaintiff disputes this and contends that Satterwhite sprayed a burst of mace through a crack in plaintiff's cell door frame. (Pl.'s Depo. pp. 67, 69.) Plaintiff admits that the mace did not adversely effect him, aside from coughing two or three times, because he had previously hung a sheet covering the crack in his cell door to prevent bugs and dust from coming into his cell.[2] (Id. pp. 67, 69, 71.) It is undisputed that Satterwhite then motioned for the anticipated use of force team to come into the cell observation area. (Boyd Aff. ¶ 33 and Pl.'s Depo. pp. 71-72.)

The anticipated use of force team consisting of defendants Ettson, with identified responsibility for the upper right, and Cameron, responsible for the upper left, as well as four other officers identified as follows: 1) Smith, with a shield; 2) Kearney, with lower right responsibility;

---

[2] Plaintiff states that the sheet hung straight down and did not block plaintiff's cell window or the food trap. (Id. p. 70.) Defendants assert, by contrast, based on the video recording described in the text above, that the sheet did block the food trap. (Boyd Aff. ¶¶ 29, 41.)

4

3) Blackard, with lower left responsibility; and 4) Fisher, responsible for operating the video camera. (Boyd Aff. ¶ 38.) They began assembling outside of plaintiff's cell, dressed in gear in preparation to enter plaintiff's cell and forcibly extract plaintiff. (Id.) Defendants Satterwhite, Brooks, Roach, and Boyd were present in the immediate area. (Id. ¶ 40.)

At this point, officer Fisher began to videotape the incident. (Def.s' Ex. B-5, B-6.)[3] As the video begins, defendants and the cell extraction team are assembling outside of plaintiff's cell. (Id.; T 02:19:18.) Boyd can be heard stating that plaintiff "was not OC pepper-sprayed due to him having his shower curtain up against the window." (Id.; T 02:19:32.) The video shows plaintiff standing in the doorway of his cell. (Id.; T 02:19:50.)

After Boyd's statement regarding the pepper spray, the cell extraction team lines up and prepares to enter plaintiff's cell. (Id.; T 02:20:14.) Officer Smith, the "shield man," then bangs his shield against plaintiff's cell door in an effort to intimidate plaintiff. (Id. and Def.s' Mem. in Supp. p. 8.; T 2:20:35) Next, plaintiff's cell door opens and several officers wearing helmets, gloves, and shoulder and elbow pads, rush into plaintiff's cell. (Boyd Aff. Ex.s B-5 and B-6; T 02:20:44.)

Then, for the next two seconds, the video allows a limited view into a portion of the cell. Plaintiff can be seen jumping to his right, while one of the officers is grabbing at plaintiff's arms. (Id. T 02:20:45- 02:20:47.) Plaintiff, who is wearing only white underwear briefs, is moved up against his cell observation window. (Id.) After that point, for about ten (10) seconds, the camera operator focuses the camera down below plaintiff's cell window; all that is visible from the video

---

[3] Defendant submitted two time-lapsed video recordings of the cell extraction at issue. (Def.s' Ex. B-5, B-6.) Defendants' exhibit B-5 is a real time video recording of the entire incident, whereas defendants' exhibit B-6 is a slow motion excerpt of the incident. (Id.) The court cites the video's time stamp as T, followed by the applicable time.

5

is plaintiff's solid metal door, the floor, and the backs and legs of officers, with a few fleeting exceptions. (Id.; T 02:20:48-02:20:58.) At one point, for less than one second, the camera swipes past the cell window again, but all that can be seen is a fuzzy image of an officer in motion. (Id. T 02:20:50). A second later, defendant Boyd calls out "baton." (Id. T 02:20:51). Several seconds later, what appears to be plaintiff's foot can be seen, through one of the officer's legs, along with what appears to be a baton or other instrument. (Id. T 02:20:56). However, during this ten (10) second time period it is not possible to determine all that is happening inside of plaintiff's cell, based on the video clip.

According to plaintiff, officers immediately began swinging batons and throwing punches at him when they entered the cell. (Compl. ¶ 9; Pl.'s Depo. p. 73.) Plaintiff also alleges that, in the course of the incident, defendant Satterwhite punched him in the face, slammed his head against the doorway, and hit him in the back of the legs with a baton. (Id. ¶¶ 10, 14; Pl.'s Depo. p. 98.) Plaintiff further alleges that Ettson, Cameron, Brooks, and Roach punched him in the head, nose, stomach, and back, and that Boyd hit him in the back of the legs with a baton. (Id. ¶ 11; Pl.'s Depo. pp. 75-76.)

Based on what appears on the video, the struggle with plaintiff moves from plaintiff's cell out into the hallway. (Id.; T 02:20:57.) During the next several seconds, the camera operator focuses the camera on the correctional officer's legs. It is difficult to discern what is occurring between plaintiff and the officers. (Id.; T 02:20:57-02:21:02.) As plaintiff is pushed up against the wall, defendant Roach, according to his own admission, reaches in and delivers a close fist hammer fist blow to plaintiff's shoulder area. (Id.; Boyd Aff. ¶ 60.) Then, based on the video, plaintiff appears to move backward. (Id.; T 02:20:59.) Shortly thereafter, the group brings plaintiff to the

6

ground and the officers apply restraints to plaintiff. (Id.; T 02:21:12-02:21:59.) Throughout the time in the hallway, correctional officers can be heard instructing plaintiff to stop resisting. (Id.)

Once plaintiff is restrained, the cell extraction team stands plaintiff on his feet. (Id.; T 02:21:59.) On the video, there is indecipherable shouting among plaintiff, inmate Robinson, and unknown inmates in the area. (Id.) An inmate can be heard yelling encouragement to plaintiff, to which plaintiff replies: "I love it. You know I love violence." (Id.;T 02:22:22.) Plaintiff repeatedly utters the phrase: "I love violence." (Id.;T 02:22:22-02:22:38.)

Shortly after the initial verbal exchanges with the Hcon inmates, plaintiff calls out the following: "Hey, Brooks–this-this handcuff is twisted." Defendant Brooks replies: "What." Some of the anticipated use of force team members then reply: "That's all right. It'll be alright." Brooks then states: "We're gonna get you straight. We're gonna get you straight." (Id.; 02:23:31-02:23:38.) Plaintiff then calls out: "Hey Mellow." (Id.;T 02:23:50.) Another inmate replies, "Hey Mellow, be proud Mellow." (Id.; 02:23:59.) Plaintiff calls out twice: "Hugh?" (Id.; 02:24:01-06.) Plaintiff then continues speaking back and forth with the other inmates, and it is difficult to decipher what is being said at this time. (Id.) Plaintiff is seen smiling, laughing, and joking with members of the anticipated use of force team. (Id.) Plaintiff is placed back into his cell after the restraints are applied. (Id.; T 02:24:54.) The video tape of the incident concludes at this point. (Id.)

Later that day, plaintiff was taken to Duke Regional Medical Center. (Pl.'s Resp. Ex. D.) Plaintiff was treated for a broken nose, cuts to the top and back of his head, a cut on his left eyebrow which required stitches, and a puncture wound to his left ear.[4] (Id. pp. 2, 3, 5, 12.) Plaintiff

---

[4] Plaintiff alleged in his complaint and testified at deposition that defendant Roach bit him on the ear in the course of the incident at issue. (Compl. ¶ 15; Pl.'s Depo, p. 120.) Roach denies biting plaintiff, and defendants contend that the medical evidence does not unequivocally

continues to suffer from breathing issues, headaches, and back pain as a result of the alleged excessive force. (Id. pp. 13, 19-22.)

After plaintiff's cell extraction on November 25, 2010, he was charged administratively with two prison disciplinary offenses. (Answer, Ex. A, p. 1.) Specifically, plaintiff was charged with a B3 offense ("tamper with, damage or block any device") for allegedly covering his cell window and blocking the food-service trap door prior to the alleged use of force. Id. Plaintiff also was charged with a C3 offense ("fail to obey the lawful order of a prison official") for allegedly creating a disturbance by banging on his cell door and refusing to place his hands through his food-service trap in order to be restrained. Id.

On January 28, 2011, plaintiff admitted to both charges in exchange for a reduced punishment. (Id. p. 8.) Plaintiff's written waiver and plea agreement provided in pertinent part that he:

> freely acknowledge[s] that I am guilty of the offense(s). I am willing to waive a hearing before the hearing officer and I accept the following reduced penalty/penalties for offense(s) set out below. This waiver also waives the right to appeal. I fully understand my right to a hearing and I have not been coerced or intimidated by anyone into signing this waiver.

Id. In accordance with the terms of the plea agreement, plaintiff was sentenced to the reduced penalty.

---

establish that the laceration on plaintiff's ear was a bite mark or that it was obtained in the course of the instant incident. ((DE 52) Ex. D, p. 13; Pl.'s Resp. Ex. D, p. 2.) For the reasons that follow, the court need not address this purported discrepancy in ruling on the motion for summary judgment.

8

**DISCUSSION**

A.  Motion for Summary Judgment

    1.  Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

    2.  Analysis

In support of their motion for summary judgment, defendants assert the defense of qualified immunity. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009). The court first determines whether defendants violated plaintiff's Eighth Amendment rights by using excessive force against him.

9

The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" which constitutes cruel and unusual punishment. Whitley v. Albers, 475 U.S. 312, 319 (1986). The excessive force inquiry has an objective prong and a subjective prong. Under the objective prong, a plaintiff must establish that the forced used was "nontrivial." Wilkins v. Gaddy, 559 U.S. 34, 39 (2010). Defendants do not contend here that the force used was nontrivial, but rather focus their argument on whether plaintiff established a genuine issue of material fact as to the remaining "core judicial inquiry," see id. at 37, whether force was applied maliciously and sadistically to cause harm, which analysis is a component of the subjective component of the Eighth Amendment inquiry.

To satisfy the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 297 (1991). For an excessive force claim, the relevant state of mind is "wantonness in the infliction of pain." Whitley, 475 U.S. at 322. Although "[a]n express intent to inflict unnecessary pain is not required" to establish an excessive force claim under the Eighth Amendment, an inmate must show that the defendant inflicted "unnecessary and wanton pain and suffering," "maliciously and sadistically for the very purpose of causing harm." Id. at 319, 320-21. In determining whether a prison official has acted with "wantonness," relevant factors include: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) any efforts made to temper the severity of a forceful response. Whitley, 475 U.S. at 321; Hudson v. McMillian, 503 U.S. 1, 7 (1992).

Applying the Whitley factors set forth above to the instant use of force incident, the court finds plaintiff is able to establish a genuine issue of material fact as to the application of the subjective prong of the Eighth Amendment test – whether defendants acted with wantonness in the

infliction of pain. With respect to the need for force factor, defendants contend that plaintiff was engaged in a cell disturbance which threatened security. Plaintiff, however, disputes this, and, instead, states that he merely knocked on his cell window to get the nurse's attention to alert her to the fact that inmate Robinson needed assistance. The parties further dispute whether any correctional officer ordered plaintiff to submit to being handcuffed prior to the cell extraction. In addition, the parties dispute whether plaintiff blocked his food trap door to prevent the officers from deploying mace, which could have negated the need for a cell extraction. Although defendants argue that the video demonstrates a need for force, these alleged incidents occurred prior to the start of the video tape. As a result, plaintiff has demonstrated a genuine issue of fact as to whether and what extent force was needed at the time defendants applied it.

The court next considers the relationship between the need for force and the amount of force that was used. As stated, there is a genuine issue of fact as to whether force was necessary. Additionally, plaintiff presented deposition testimony that Cameron and Ettson immediately began throwing punches upon entering his cell, that Satterwhite slammed his head against the wall in plaintiff's cell doorway, and that Ettson, Cameron, Brooks, and Roach punched plaintiff in the head, nose, stomach, and back during the cell extraction. (Compl. Pl.'s Depo. pp. 73, 75-76, 93, 108-109, 115-117.) In light of this evidence, the court finds a genuine issue of fact as to whether this Whitley factor weighs in plaintiff's favor. Viewing the evidence at this stage in the light most favorable to plaintiff, the first two Whitley factors weigh in favor of plaintiff.

The court next considers the third Whitley factor, the extent of any threat posed by plaintiff to the staff or other inmates, as reasonably perceived by defendants based upon the facts known to them at the time. Defendants assert that force was necessary in this instance because

11

plaintiff was engaged in a cell disturbance, and cell disturbances pose a particular danger to Hcon staff, other inmates, and institutional security. Defendants further assert that unabated cell disturbances metastasize and spread throughout an Hcon population. Defendants state that plaintiff was removed from his cell to abate plaintiff's continuing disruptive behavior.

Plaintiff, however, asserts that he was not engaged in a cell disturbance and that he did not refuse any direct order to submit to handcuffing. The video tape supports plaintiff's contention that he was not engaged in a cell disturbance in that plaintiff can be seen on the video tape calmly standing in the window of his cell immediately prior to the cell extraction. Additionally, although plaintiff pleaded guilty to a disciplinary charge for failing to obey a direct order in relation to the instant offense, the video reflects that no officer gave plaintiff a direct order to submit to handcuffs immediately prior to the cell extraction while the video tape is running. In light of this evidence, viewed in the light most favorable to plaintiff, the third Whitley factor also weighs in plaintiff's favor.

Finally, the court considers the fourth Whitley factor, whether defendants made any efforts to temper the severity of a forceful response. Again, there is conflicting evidence as to whether plaintiff was provided the opportunity to voluntarily submit to handcuffing prior to the cell extraction. Thus, there is a genuine issue of fact bearing on the final Whitley factor. Based upon the foregoing, viewing the evidence in the light most favorable to plaintiff, a trier of fact could conclude based on the Whitley factors that defendants used force wantonly and maliciously for the purpose of causing harm, and that the supervisory defendants failed to protect plaintiff from the alleged excessive force.

Defendants argue that the video demonstrates that they did not assert excessive force or fail to protect plaintiff from the alleged excessive force. In support of this argument, defendants cite the United States Supreme Court's ruling in Scott v. Harris, 550 U.S. 372 (2007), where the Court held that, when "opposing parties tell two different stories, one of which is blatantly contradicted" by video evidence in the court's record, "so that no reasonable jury could believe it, a court should not adopt that version of the facts . . . ." Id. at 380. The Court further held that rather than relying upon "visible fiction" set forth by the party whose version of events is contradicted by the video evidence, a court should "view[] the facts in the light depicted by the videotape." Id. at 381. The Fourth Circuit in Witt v. West Virginia State Police, Troop 2, 633 F.3d 272 (4th Cir. 2011), subsequently stated that the Court's holding in Scott does not permit a court to reject one side's recitation of the facts as a matter of law if the "documentary evidence, such as a video," merely "offers *some* support for [the other side's] version of events." Id. at 276 (emphasis in original).

Defendants contend that the videotape of the cell extraction clearly reflects that defendants did not use excessive force. The video, however, is not nearly so clear.

Notably, the focus of the video is diverted from the use of force incident shortly after officers enter plaintiff's cell. Accordingly, it is impossible to determine whether plaintiff's contention that Ettson and Cameron entered plaintiff's cell and immediately began hitting him on the head and face is accurate. Nor does the video support Satterwhite's contention that he did not participate in the excessive force incident. Although the video reflects that Satterwhite initially is outside of the altercation, Satterwhite can be seen in the video engaged in some unknown activity while plaintiff is in the doorway of his cell. The events which occurred outside of the cell are equally unclear as much of the video focuses on the correctional officers legs, showing only intermittent glimpses of

13

plaintiff. Thus, the court finds that the videotape does not discredit plaintiff's version of the facts so that no reasonable jury could believe plaintiff's account of the events.

In sum, the court finds that there are genuine issues of material fact with regard to whether defendants used force wantonly and maliciously for the purpose of causing harm, which are not resolved by the video tape. Thus, there is a genuine issue of material fact with regard to whether defendants' violated plaintiff's Eighth Amendment rights. See, e.g., Thompson v. Shelton, 541 F. App'x 247, 250 (4th Cir. 2013) (per curiam); see also, Comeaux v. Sutton, 496 F. App'x 368, 372 (5th Cir. 2012) (per curiam); Anderson v. McCaleb, 480 F. App'x 768, 771–73 (5th Cir. 2012) (per curiam).

The court now determines whether defendants are entitled to the affirmative defense of qualified immunity. It is clearly established that the Eighth Amendment forbids the "unnecessary and wanton infliction of pain" against inmates. Whitley, 475 U.S. at 319 (internal quotation marks omitted). Given that a fact finder in this case could find, viewing the evidence in the light most favorable to plaintiff, that the alleged force was used in a malicious and sadistic manner in an attempt to cause harm, and not in a good faith effort for legitimate needs, under these circumstances a reasonable officer would have known that his conduct violated the law. See Tedder v. Johnson, 527 F. App'x 269, 274 (4th Cir. 2013) ("Johnson therefore cannot claim qualified immunity because malicious and sadistic use of force for the very purpose of causing pain is always in violation of clearly established law. This is not an incorrect guess in a gray area of law.") (citation omitted); see also, Davidson v. City of Statesville, No. 5:10-CV-182-RLV-DSC, 2012 WL 5208603, at *3 (W.D.N.C. Oct. 22, 2012) ("As Plaintiff has . . . established a genuine issue of material fact as to whether the remaining individual Defendants acted in a manner intended to be injurious and used

14

their tasers needlessly and without a legitimate purpose, Defendants' claims of qualified immunity cannot bar suit.") (internal quotations omitted). Thus, defendants are not entitled to qualified immunity.

B.      Joint Status Report and Proposed Plan

To facilitate the adjudication of this action, the court sets the following deadlines for conference activities and for the submission of the parties' joint status report and proposed plan.

The parties are directed to participate in a conference in aid of trial planning not later than fourteen (14) days after the date of this order. The parties are responsible for arranging the conference and for attempting in good faith to agree on a proposed plan. The report and plan shall be filed with the court within seven days after the conference. The following must be considered at the conference and included in the report and plan:

> A.      This case does not properly fall within a category of case automatically to be selected for mediation pursuant to Local Civil Rule 101.1a(b). However, the report and plan must include a deadline for the completion of alternative dispute resolution;
>
> B.      The anticipated length of trial;
>
> C.      Suggested alternative trial dates or ranges of dates which would be acceptable for trial;
>
> D.      Any scheduling issue affecting counsel or the parties. The report affords the opportunity to announce compelling personal or professional considerations, as appropriate, which may affect the scheduling or course of proceedings.

If the parties have made a good faith attempt to confer and submit a joint report and plan, but have been unable to do so, the parties shall file separate plans within the allotted time period, each

15

of which must include the parties' respective positions and information as would be included in a joint report.

## CONCLUSION

Based upon the foregoing, defendants' motion for summary judgment (DE 51) is DENIED. The parties' joint status report and proposed plan must be filed in accordance with the time frame set forth above.

SO ORDERED, this the 10th day of June, 2014.

LOUISE W. FLANAGAN
United States District Judge